# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| GREGORY KING, | Case No. 19-CV-2108 (NEB/TNL) |
| Plaintiff, | |
| v. | ORDER ON MOTION FOR SUMMARY JUDGMENT |
| STATE OF MINNESOTA GUARDIAN AD LITEM BOARD, | |
| Defendant. | |

Plaintiff Gregory King worked for the Minnesota Guardian Ad Litem Board ("GALB"). In 2017, King's supervisor learned of allegations that King had behaved inappropriately at work. Following an investigation, the GALB fired King. King brought this suit, alleging retaliation and age, sex, and race discrimination. For the reasons that follow, the Court grants the GALB's motion for summary judgment and dismisses the case.

# BACKGROUND

## I.    King's Employment with the GALB

King began working for the Minnesota guardian ad litem program in 2002 as a program coordinator.[1] (ECF No. 35-6 at 1–27[2] ("King Dep.") at 62:6–10.) At some point, King's title changed to Guardian Ad Litem ("GAL") Manager, but his duties remained substantially the same. (*See* King Dep. at 65:21–24; ECF No. 34 at 4 n.1.) As a GAL Manager, King was responsible for, among other things, "overseeing district-wide program operations," supervising and coordinating the work of guardians ad litem, and managing the recruitment and hiring of new GAL staff. (ECF No. 35-6 at 28.) King generally received positive reviews from his supervisors. (ECF No. 43-4 at 11:10–24; ECF No. 43-5 (King's performance reviews).)

King's retaliation claim stems from a letter he sent to his supervisor, GALB Program Administrator Kristen Trebil, on October 5, 2017. Under the plan for fiscal year 2018, GAL districts were to receive financial allocations based on the size of each district's juvenile caseload. (ECF No. 39 ("Trebil Decl.") ¶ 4.) In his letter, King expressed concern that several districts' caseloads would appear inflated because they had not been appropriately closing cases. (*See* ECF No. 35-6 at 66–67; King Dep. at 187:16–188:4.) King

---

[1] The GALB was not established until 2010. (ECF No. 35-6 at 103.) Before that, the state's guardian ad litem program was under the umbrella of the state court system. (*Id.*)

[2] The transcript of King's deposition is on ECF pages one through twenty-seven. Subsequent citations to page numbers refer to the transcript's pagination.

outlined the implications of allocating funds based on this faulty data: it would incentivize leaving cases open, lead to inefficiencies, and perhaps cause the GALB to lose credibility with the state legislature. (ECF No. 35-6 at 67.) Trebil thanked King for bringing this issue to her attention and said that she would look into it. (King Dep. at 189:9–11.) She later changed the method for allocating funds. (Trebil Decl. ¶ 4.)

## II.    Misconduct Allegations and Initial Investigation

In early November 2017, approximately one month after King's letter, the GALB held a training at Mystic Lake Casino. (ECF No. 39-2 ("Trebil's Timeline") at 1.) Several attendees were discussing the burgeoning "Me Too" movement, which focused on women's experiences with sexual harassment. (*Id.*; ECF No. 38-2 ("Investigation Report") at 1.) During that discussion, King walked by, and an attendee remarked, "It doesn't just happen in Hollywood," apparently implying that King was guilty of similar behavior. (*Id.*) The attendee also stated that she knew a woman whom King had sexually harassed. (*Id.*) Another attendee heard the remark and reported it to her supervisor. (*Id.*) That attendee also reported that King had an inappropriate sexual relationship with a prospective guardian ad litem in 2006 and 2007. (*Id.*) Eventually, these allegations reached Trebil, and Trebil then informed Linda Potter, the GALB's Human Resources Director. (*Id.* at 1–2.)

Trebil and Potter investigated the allegations. (*Id.* at 2.) They interviewed, among other people, A.A.,[3] who was the prospective guardian ad litem with whom King allegedly had an inappropriate relationship. (*Id.*) A.A. told Trebil that in 2006 and 2007, King promised that he would personally train her to become a guardian ad litem, and that he then pursued a sexual relationship with her. (*Id.* at 2; Trebil's Timeline at 3.) After the interview, Trebil put King on paid administrative leave pending further investigation. (Investigation Rep. at 2; Trebil's Timeline at 3.)

In late November and early December 2017, Trebil and Potter continued to interview witnesses, and Trebil covered for King as the manager of the Tenth District GAL program. (Investigation Rep. at 2.) Trebil's interviews with GALB staff revealed that King had engaged in an improper personal relationship with C.C., a former guardian ad litem who worked for the GALB from 2010 until 2017 and reported to King.[4] (*Id.*) While supervising the Tenth District in King's absence, Trebil discovered several other issues with King's performance. (Trebil's Timeline at 4–7.) She found multiple issues with the

---

[3] The parties agreed to use pseudonymous initials to refer to certain persons. (ECF No. 34 at 7 n.2.) For simplicity, and to protect privacy, the Court will use these initials as well.

[4] It seems that this was not the first that Trebil or Potter learned of King's relationship with C.C. Prior to her investigation, Trebil heard rumors that King had an inappropriate personal relationship with a guardian ad litem who reported to him. (Trebil's Timeline at 3.) King had previously told Potter that he was rumored to be having an affair with C.C., and at some point after that told Potter that he used to date a guardian ad litem. (*Id.*)

Tenth District's fee collection practices, which King supervised. (*Id.* at 4–5.) In addition, she discovered that King continued to use an old case management program even after Trebil directed him to stop using it. (*Id.* at 5.) King also assigned guardians ad litem to criminal cases in contravention of GALB policy and state statute. (*Id.* at 5–6.) Finally, King provided false or misleading information to Trebil about his supervision of Tenth District GAL staff and operations. (*Id.* at 6–7.)

As a result of the preliminary investigation findings, Trebil and Potter hired an outside investigator, Michelle Soldo, to further investigate the issues.[5] (Investigation Rep. at 2; ECF No. 35-10 at 10:12–18.)

### III.    Soldo's Investigation and Its Findings

Soldo conducted the fact-finding part of her investigation from early December 2017 to January 11, 2018.[6] (Investigation Rep. at 2.) As part of the investigation, Soldo interviewed several witnesses, including King, and reviewed exhibits. (*See* Investigation Rep. at 3–4, 9–11 (listing exhibits).) King was represented by an attorney during the investigation. (*Id.* at 2.)

---

[5] Soldo is a licensed attorney who has conducted more than five hundred investigations. (ECF No. 38 ¶ 2.) She has a non-exclusive contract with the State of Minnesota to conduct investigations. (*Id.*; *see also* ECF No. 43-7.)

[6] The Investigation Report states that fact-finding activity ended on January 11, 2017, but this is likely a typographical error.

Soldo issued her Investigation Report in late February 2018. (*Id.* at 12.) She found that King engaged in multiple instances of misconduct while working for the GALB. (*Id.* at 5–8.) Specifically, Soldo found evidence of three improper relationships. First, Soldo found that the allegations that King had an inappropriate sexual relationship with A.A. in 2006 and 2007 were substantiated. (*Id.* at 5.) King had introduced himself to A.A. as the Tenth District GAL manager, gave her a training manual, offered to train her and have her sworn in, and offered to hire her as a guardian ad litem. (*Id.*) Instead, King initiated a personal, and eventually sexual, relationship with A.A., and never trained her or hired her as he had promised. (*Id.*; *id.*, Attach. A at 11; *see also* ECF No. 38-3 at 2–5 (A.A.'s account of her and King's relationship).)

Second, Soldo found that King engaged in similar behavior with another woman, B.B., roughly a decade later, though this relationship, unlike King's with A.A., did not become sexual. (Investigation Rep. at 5; *id.*, Attach. A at 13–14.) B.B. believed that she and King were dating, but King claims that they were merely friends. (*Id.*, Attach. A at 14.)

Third, Soldo concluded that King had a perceived improper relationship with C.C., a guardian ad litem who reported to King.[7] Other staff members perceived that King gave C.C. preferential treatment, and Soldo concluded that exhibits, including email

---

[7] Soldo is careful not to say that King actually had an improper relationship with C.C., but rather that he "engaged in behavior leading multiple GAL staff reporting to him to perceive he had an improper special and potentially romantic relationship" with C.C. (Investigation Rep. at 5.)

conversations between King and C.C., supported the perception that they had a "special relationship." (Investigation Rep., Attach. A at 14–20.) King loaned C.C. money and had dinners and spent holidays with C.C. and her family. (*Id.* at 17.) King claimed that he did not treat C.C. preferentially and denied that they were dating or that they had a sexual relationship. (*Id.* at 19–20.)

In addition to these relationships, Soldo's Investigation Report also concluded that King made remarks to GALB staff that they perceived as sexually suggestive. (Investigation Rep. at 6.) King sometimes referred to himself as "chocolate cake," and once told a GALB employee that "not everyone gets a piece of the chocolate cake."[8] (*Id.*; *id.*, Attach. A at 21 n.14, 22.) King also bragged to GALB staff about dating or having an affair with a Tenth Judicial District Judge, a guardian ad litem volunteer, and C.C. (Investigation Rep. at 6.)

Soldo also found that King "knowingly and intentionally circumvented established State procedures." (*Id.*) King deficiently supervised the Tenth District's fee collection practice, continued to use the Galaxy case management system even after

---

[8] King claims that referring to himself as "chocolate cake" is not a sexual innuendo but is a reference to his and his staff's shared love of chocolate and the bowl of chocolate he sometimes kept in his office. (King Decl. ¶ 15; ECF No. 46 at 29:24–30:1 (filed under seal); ECF No. 35-6 at 109). Elsewhere, King denies ever having referred to himself as "chocolate cake." (ECF No. 41 at 26.) Several colleagues testified that they had never heard King refer to himself as "chocolate cake." (ECF Nos. 43-4 at 19:10–16, 46 at 29:21–23; 43-9 at 16:4–6.)

Trebil told him to transition to a new system, and assigned guardians ad litem to criminal cases without authority to do so.[9] (*Id.* at 6–8.) Further, Soldo concluded that King "knowingly provided false or misleading information to . . . Trebil, . . . and disregarded work directives he received." (*Id.* at 8.)

## IV. King's Termination

Trebil reviewed Soldo's report and discussed its findings with Potter and legal counsel for the GALB. (Trebil Decl. ¶ 6.) She then decided to terminate King. (*Id.*) On March 6, 2018, Trebil gave King a Notice of Termination. (ECF No. 43-8.) Trebil listed several reasons for King's termination, including, among other things, that he: abused his position of power by engaging in relationships with women in subordinate positions and women seeking employment; violated GALB policies by not making required entries and by withholding information from Tenth District judges regarding two cases; failed to properly supervise the district's fee collection practices; and provided false or misleading information to Trebil, which "resulted in a lack of trust and confidence in [King's] ability to appropriately manage [his] staff and district." (*Id.*)

King then appealed his termination, which the Minnesota Judicial Branch's Human Resources Rules entitle him to do. (King Dep. at 214:4–7; ECF No. 35-6 at 128–29.) After a two-day hearing, the appeals panel determined that Trebil's decision to

---

[9] King claims that appointing a guardian ad litem to a criminal case is not prohibited and that "such appointments are lawful court orders." (ECF No. 35-6 at 115.)

terminate King was reasonable. (ECF No. 35-6 at 60–65.) The appeal panel's findings and conclusions largely mirror those of the Investigation Report. (*See id.*) They depart only in concluding that King was not at fault for the issues with the Tenth District's fee collection practices. (*Id.* at 63.) King filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that the GALB fired him because of his age, race, and sex. (*Id.* at 96–97.) The EEOC closed King's file because it could not determine that the GALB had violated any statutes. (*Id.* at 95.)

After the EEOC denied his claim, King brought this suit, alleging that the GALB violated both federal and state anti-discrimination laws by terminating him because of his race, sex, and age. (ECF No. 1 ¶¶ 36–97.) He also claims that he was fired in retaliation for his October 5, 2017 letter to Trebil, in violation of the Minnesota Whistleblower Act. (*Id.* ¶¶ 98–112.) The GALB moved for summary judgment. (ECF No. 32.)

## ANALYSIS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit

of all reasonable inferences supported by the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

When there is no direct evidence of discrimination, courts apply the *McDonnell Douglas* burden shifting framework to federal discrimination claims. *Xuan Huynh v. U.S. Dept. of Transp.*, 794 F.3d 952, 958 (8th Cir. 2015) (citing *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under this framework, King must first make a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was otherwise qualified for his job; (3) he suffered an adverse employment action; and (4) circumstances permit an inference of discrimination. *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016) (citation omitted). If King makes a prima facie case, the burden shifts to the GALB to establish a legitimate, nondiscriminatory reason for firing King. *Id.* (citing *McDonell Douglas*, 411 U.S. at 802). If the GALB is able to provide such a reason, the burden shifts back to King to establish that the GALB's purported reason for firing him was pretextual. *Id.* (citation omitted).

Minnesota employs the same framework to analyze employment discrimination claims under the Minnesota Human Rights Act. *Dietrich v. Can. Pac. Ltd.*, 536 N.W.2d 319, 323 (Minn. 1995) (citations omitted). There is no dispute that King is a member of a

protected class based on his age, race, and sex.[10] For these two reasons, the Court can analyze all six of King's discrimination claims together.

Under Minnesota's Whistleblower Act, an employer may not retaliatorily discharge an employee who reports a violation of state or federal law. Minn. Stat. § 181.932, subdiv. 1(1). An employee who is discharged in violation of the Whistleblower Act can bring a civil action for damages. Minn. Stat. § 181.935(a). Like King's discrimination claims, Whistleblower Act claims are analyzed under the *McDonell Douglas* framework. *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). Thus, the same framework applies to all seven of King's claims.

## I. Prima Facie Case

### A. Discrimination Claims

King has failed to establish a prima facie case of discrimination because he has failed to show that the circumstances of his termination support an inference of discrimination. One way to raise an inference of discrimination is by showing that the employer treated similarly situated employees outside the protected class differently.[11]

---

[10] The parties also do not dispute that King's termination constitutes an adverse employment action. There is a dispute, discussed below, about whether placing King on administrative leave pending an investigation was an adverse employment action. *See infra* Analysis I.B.

[11] Another way of establishing that circumstances give rise to an inference of discrimination is to show evidence of pretext, but, as discussed below, King has provided no such evidence. *See infra* Analysis II.

*Carter v. Pulaski Cnty. Special Sch. Dist.*, 956 F.3d 1055, 1058 (8th Cir. 2020) (citation omitted). To be considered similarly situated, two employees must be "similarly situated in all relevant respects," including being accused of the same wrongful conduct. *Id.* (citation omitted). Employees who report to different supervisors are rarely considered to be similarly situated. *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008).

King has not shown that he was treated differently than other GALB employees with whom he was similarly situated. King first contends that Trebil was similarly situated to him and received different treatment. (ECF No. 41 at 29.) This argument fails to two reasons. First, the record contains no evidence that King and Trebil were accused of the same wrongful conduct. There is no indication that Trebil used her job to start personal and romantic relationships with subordinates or prospective guardians ad litem, failed to follow her supervisor's directions, or made comments in the workplace that coworkers perceived as sexually charged. Second, King and Trebil are probably not similarly situated because they report to different supervisors. *Fields*, 520 F.3d at 864. King reported to Trebil, (King Dep. at 15:10), while Trebil reported to Dawn Torgerson. (ECF No. 43-6 at 8:9–11.)

King also argues by implication that his counterparts at the Fourth and Seventh Districts were similarly situated and treated differently than him. (ECF No. 41 at 29.) King observes that the managers in the Fourth and Seventh Judicial Districts failed to appropriately close cases (similar to behavior assigned to King), yet they were not fired.

(*Id.*) King cites his own declaration as support, which states that his "treatment was different than what was received by his Caucasian Manager colleagues." (ECF No. 42 ¶ 17.) But at this stage, King cannot rely on bare allegations, he must "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation or conjecture." *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017) (cleaned up).

Though King did not cite it, King's letter to Trebil better supports his assertion about other managers' misconduct. The letter explains that there were hundreds of cases in the Fourth and Seventh Judicial Districts that should have been closed but were marked open in the database.[12] (ECF No. 35-6 at 66–67.) Nevertheless, King's proposed comparison fails. First, the GALB did not cite King's failure to close cases as a reason for terminating him, nor is there any evidence that King failed to close cases that should have been closed.[13] Second, and more importantly, King has provided no evidence that the Fourth and Seventh District managers were accused of having inappropriate personal

---

[12] It is not clear that these errors are attributable to the Fourth and Seventh Districts' managers, but viewing the facts in the light most favorable to King, as the Court must for the purposes of this motion, it is fair to attribute these errors to King's counterparts in the Fourth and Seventh Districts. *Carter*, 956 F.3d at 1057 (citation omitted).

[13] King was terminated for analogous conduct, such as "failing to make required entries on the records in [his] control," attempting to impermissibly increase his case load, and failing to document his work on certain cases. (ECF No. 43-8 (notice of termination).) But even assuming that the other managers' misconduct was sufficiently similar to King's, King's comparison would still fail because King was accused of additional misconduct that the other managers were not accused of.

and sexual relationships with prospective guardians ad litem or their subordinates. Nor were the other managers accused of failing to follow their supervisors' instructions or of inadequately supervising their districts' fee collection programs. When a plaintiff is accused of additional misconduct that proposed comparators did not engage in, the plaintiff is not similarly situated to those proposed comparators. *Carter*, 956 F.3d at 1058. King has not raised a genuine issue of material fact about whether the circumstances give rise to an inference of discrimination. They do not, so as a matter of law his discrimination claims fail.

### B. *Whistleblower Act Claims*

To make a prima facie case of retaliatory discharge, King must establish: (1) that he engaged in protected conduct; (2) that the GALB took an "adverse employment action";[14] and (3) a causal connection between the protected conduct and the adverse employment action. *Cokley*, 623 N.W.2d at 630 (citation omitted). At the hearing, the GALB conceded that King's October 5, 2017 letter to Trebil was likely protected conduct under the Whistleblower Act. Although the GALB does not argue that it did not take an adverse employment action, the parties have differing views on when the adverse employment action occurred. The only disputes, then, are when the adverse employment

---

[14] Under the Whistleblower Act, an employer may not "discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment." Minn. Stat. § 181.932, subdiv. 1(1).

action occurred and whether it was causally connected to his October 5, 2017 letter to Trebil.

Because the only support King offers to support a causal connection is the temporal proximity between his letter to Trebil and the adverse employment action, the Court must first address the parties' dispute regarding when an adverse employment action occurred. King argues that being placed on administrative leave was an adverse employment action. In his brief, King claims that there was "approximately one month" between King's October 5, 2017 letter and "the termination." (ECF No. 41 at 40.) But King was not terminated until March 6, 2018. (ECF No. 43-8.) The Court therefore concludes that the "termination" King is referring to is his placement on administrative leave, which happened on November 20, 2017. (Trebil's Timeline at 2; King Dep. at 198:1–7.) The GALB contends that the administrative leave was not an adverse employment action and that King's termination is the relevant adverse employment action.

Administrative leave may be an adverse employment action, but not always. *Moore v. City of New Brighton*, 932 N.W.2d 317, 325–27 (Minn. Ct. App. 2019). When, for instance, an employee is placed on administrative leave for a "lengthy period inconsistent with the alleged investigatory reason for placing him on leave," there is a fact issue regarding whether it constitutes an adverse employment action. *Id.* at 327. In other instances, administrative leave may not be an adverse employment action. *Id.* The Court need not resolve this issue, because even if King's placement on administrative leave was

an adverse employment action, he still lacks a strong enough temporal connection to establish the causation element of his prima facie case.

"Unless 'very close' in time, mere temporal proximity is not sufficient to create a genuine issue of fact regarding causation." *Schaefer v. Cargill Kitchen Sols., Inc.*, No. A16-0154, 2016 WL 6570240, at *9 (Minn. Ct. App. Nov. 7, 2016) (citation omitted). In *Schaefer*, the Minnesota Court of Appeals cited a case suggesting that a two-week interval was "barely" sufficient to establish causation and another concluding that a three-week interval was not sufficiently close in time to establish causation.[15] *Id.* In contrast, six-and-a-half weeks passed between King's letter to Trebil and his placement on administrative leave. The temporal proximity of these events is not sufficiently close for the Court to find that it, standing alone, establishes a causal connection.[16] Aside from the temporal proximity, King has provided no other evidence of a causal connection.

_____

[15] The *Schaefer* court cited federal cases for this point but noted that Minnesota appellate courts had previously relied on federal courts' applications of the federal Whistleblower Protection Act when interpreting Minnesota's counterpart. 2016 WL 6570240, at *9 n.2 (first citing *Kidwell v. Sybaritic, Inc.*, 784 N.W.2d 220, 227 (Minn. 2010); then citing *Wayne v. MasterShield, Inc.*, 597 N.W.2d 917, 921 (Minn. Ct. App. 1999)).

[16] The cases King cites in support rely on more than just temporal proximity in finding a causal connection. *E.g.*, *Tretter v. Liquipak Int'l, Inc.*, 356 N.W.2d 713, 715 (Minn. Ct. App. 1984) (noting that the plaintiff was the only employee of her seniority to be laid off and that the employer did not hire her back several months later when it needed another employee in her department); *Thompson v. Campbell*, 845 F. Supp. 665, 675 (D. Minn. 1994) (explaining that circumstantial evidence in addition to temporal proximity supported a causal connection); *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113–14 (8th Cir. 2001) (en banc) (finding a causal connection based on temporal proximity and other circumstantial evidence). King has not identified a case where a court has found a

Additionally, intervening events can undermine a potential causal connection between protected conduct and an adverse employment action. *Slaughter v. Indep. Sch. Dist. No. 833*, No. A20-0014, 2020 WL 4579014, at *5 (Minn. Ct. App. Aug. 10, 2020) (citing *Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006)). There was a major intervening event between King's letter to Trebil and her decision to place him on administrative leave: Trebil learned of allegations that King had abused his position and engaged in inappropriate conduct at work. Even if the temporal proximity were sufficiently close to establish causation, this significant intervening event would contradict the conclusion that Trebil placed King on administrative leave because of his letter to her.

## II.     Legitimate Reason and Pretext

Even if the Court concluded that King had established a prima facie case of discrimination or retaliation, the GALB has demonstrated a legitimate, nondiscriminatory, and non-retaliatory reason for firing King. In determining whether an employer had a legitimate reason for firing an employee, a court considers not whether "the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough v. Univ. of Ark. for Med. Sci.*, 559 F.3d 855, 861–62 (8th Cir. 2009) (citations omitted). The GALB had several bases to have believed in good faith that King

causal connection when there was a six-week or longer gap and no other circumstantial evidence supporting a causal connection.

was guilty of conduct that merited termination. Most notably, the GALB relied on an extensive and detailed external investigation that substantiated the allegations against King. (Trebil Decl. ¶ 6; *see also* Investigation Rep.) Additionally, Trebil herself interviewed several witnesses, including A.A. and GALB staff members. (Trebil's Timeline at 2–3.) Based on these investigations, the GALB could have believed, in good faith, that King engaged in conduct that merited his termination.

King must then establish that the GALB's purported reasons for firing him were pretextual. *Carter*, 956 F.3d at 1058; *Cokley*, 623 N.W.2d at 630. For his discrimination claims, King must "both discredit [the GALB's] asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason for terminating [King was his race, sex, or age]." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) (citation omitted). Similarly, for his Whistleblower Act claim, King must show "both that the reason was false, and that [the protected conduct] was the real reason." *Peterson v. HealthEast Woodwinds Hosp.*, No. A14-1409, 2015 WL 4523558, at *3 (Minn. Ct. App. June 29, 2015) (quoting *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); then citing *Hadnudeen v. Onan Corp.*, 552 N.W.2d 555, 557 (Minn. 1996)) (alteration original). Proving pretext is a higher bar than a prima facie case, and evidence of pretext is "viewed in light of the employer's justification." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (internal quotation marks and citation omitted). Additionally, courts should not "reexamine[] an entity's business decisions," but should ask only

"whether the employer gave an honest explanation of its behavior." *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994) (internal quotation marks and citations omitted). Put another way, a court does not inquire whether the employer's reason was "wise, fair, or even correct . . . so long as it truly was the reason for the plaintiff's termination." *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) (internal quotation marks and citations omitted).

King cannot carry his burden of proving pretext. He has neither submitted evidence that discredits the GALB's legitimate reason for firing him nor has he shown that the circumstances permit an inference of discrimination. *Twymon*, 462 F.3d at 935. Much of King's argument that the GALB's reasons were pretextual relies on speculation and innuendo. For instance, King argues that Soldo's investigation was a "sham" that was "not fair and accurate and was extremely biased against King." (ECF No. 41 at 44.) King's main support for this assertion is that Soldo did not interview several witnesses who King believes should have been interviewed and that Soldo was paid for conducting the investigation. (*Id.*) But again, mere allegations will not suffice at the summary judgment stage, and King has put forth no evidence showing any faults with the investigation. *Ball*, 870 F.3d at 727. To the contrary, the record shows that Soldo's investigation was extensive and that Soldo is an experienced investigator. (ECF No. 38 ¶¶ 2, 4; Investigation Rep. at 9–11 (listing the exhibits Soldo reviewed in preparing the Report); *see generally id.*, Attach. A (explaining in depth Soldo's findings and their bases).)

Even if there were issues with Soldo's investigation, the scope of an investigation is a business judgment, and "shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough*, 559 F.3d at 863. Further, the critical inquiry would not be whether there were issues with the investigation, but rather whether Trebil knew the investigation was faulty but relied on it anyway. *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) (explaining that under the honest belief rule, what matters is "not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge") (internal quotation marks and citation omitted); *Twymon*, 462 F.3d at 935 (citation omitted) ("A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination."). The record contains no evidence suggesting that Trebil had any reason to doubt the Investigation Report's methodology or findings.

King also claims that the GALB has shifted its reasons for terminating him. While shifting explanations can show pretext, *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1135 (8th Cir. 2020) (citation omitted), the record does not show that the GALB's reasons have shifted over time. The remainder of King's arguments regarding pretext are either red herrings (such as his argument that the GALB's reason was pretextual because King had worked for the GALB for sixteen years without any major employment issues) or are

insufficient to establish pretext. In the latter category are various arguments that some of the reasons Trebil gave for his termination are not valid. (ECF No. 41 at 45–46.) But even crediting King's arguments, they would not suffice to establish pretext. *See Bharadwaj*, 954 F.3d at 1135 (explaining that although the falsity of a nondiscriminatory reason can establish pretext, when the plaintiff disputes details of the explanation, but does not rebut the "primary rationale," the plaintiff has not established pretext).

And finally, even if King had discredited the GALB's nondiscriminatory reasons for firing him, he has still not shown that "the circumstances permit drawing the reasonable inference that the real reason for terminating the plaintiff" was his race, age, or sex. *Twymon*, 462 F.3d at 935. As discussed above, King has not shown that any similarly situated employees were treated differently, *supra* Analysis I.A, and nothing else in the record suggests that the GALB's firing of King was discriminatory.

As for the Whistleblower Act claim, King has not submitted any evidence to suggest that the letter he sent to Trebil was the "real reason" that he was fired. *Peterson*, 2015 WL 4523558, at *3 (citations omitted). Indeed, the material in the record cuts against an inference that King was fired because of the letter; Trebil thanked King for sending the letter and later changed the method the GALB used to allocate funds to address King's concern. (King Dep. at 189:9–11; Trebil Decl. ¶ 4.) Further, the presence of an intervening event—Trebil learning of the allegations against King—also suggests that King's letter was not the reason he was fired.

With no evidence of pretext, King has not carried his burden, and the Court must grant summary judgment.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, the State of Minnesota Guardian Ad Litem Board's motion for summary judgment (ECF No. 32) is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: May 6, 2021                           BY THE COURT:

                                             s/Nancy E. Brasel
                                             Nancy E. Brasel
                                             United States District Judge